**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ITW, S.R.L., and | § | |
| ITW TECHNOLOGIES, LLC | § | |
| | § | Civil Action No. 4:20-cv-3 |
| Plaintiffs, | § | |
| | § | **JURY TRIAL DEMANDED** |
| v. | § | |
| | § | |
| JUSTIN WEATHERFORD, and | § | |
| SIGMACHEM, LLC, and | § | |
| SOLID FACTION, LLC, and | § | |
| UNICAT CATALYST TECHNOLOGIES, INC, | § | |
| and UNICAT PROCESS TECHNOLOGIES, LLC | § | |
| | § | |
| Defendants. | § | |

**COMPLAINT**

Plaintiffs ITW, S.r.l. and ITW Technologies, LLC (collectively "ITW" or "Plaintiffs"), by and through undersigned counsel, bring this Complaint for Injunctive Relief and Damages against Defendants Justin Weatherford; SigmaChem, LLC ("SigmaChem"); Solid Faction, LLC ("Solid Faction"); Unicat Catalyst Technologies, Inc., and Unicat Process Technologies, LLC. ("Unicat Catalyst," "Unicat Process" or collectively "Unicat"), and alleges the following:

**BACKGROUND**

1.      For more than five years, Justin Weatherford was ITW's highest ranking employee in the United States. As an Italian company, ITW relied on Mr. Weatherford to act on its behalf to develop and expand its business into the North American market and to comply with the terms of his consulting and employment agreements with ITW. Based on Mr. Weatherford's commitments and his position as the leader of ITW's North American operations, ITW entrusted Mr. Weatherford with its most valuable trade secrets, including the details of its confidential, proprietary

1

processes that give it a competitive advantage in its industry.

2.          Mr. Weatherford betrayed ITW's trust. He took his knowledge of ITW's trade secrets and used that information to incorporate SigmaChem to compete with ITW within days of leaving ITW's employment.  He then partnered with a larger company (Unicat Catalyst) to form a new joint venture (Unicat Process) for the sole purpose of providing the very same services to the very same clients that he was supposed to be developing for ITW, and he did so using his knowledge of ITW's trade secrets and confidential information.

3.          The only way that Mr. Weatherford could have started SigmaChem and entered a joint venture to compete with ITW was by using ITW's own secrets—secrets that he had expressly agreed to keep confidential—against it.  Mr. Weatherford admitted as much in his own emails in which he explained that ITW's proprietary methods allowed customers to clean refineries and in general any production unit or equipment in the Oil & Gas industry while staying in environmental compliance and avoiding a shutdown.  As Mr. Weatherford himself stated, "THIS IS HUGE!!!  I do not see any way possible our competitors could do this . . ."

4.          Mr. Weatherford took advantage of knowing exactly how ITW could offer customers these advantages and used it for his own benefit rather than ITW's.  By doing so, Mr. Weatherford intentionally breached his obligations to ITW and intentionally decimated ITW's North American business.

5.          Not only did Mr. Weatherford steal ITW's secrets, he acted to conceal his misdeeds from ITW.  To conceal his efforts to redirect ITW's North American business to himself and use ITW's secrets to offer customers a competing service, Mr. Weatherford deleted all of his emails from the ITW server and, on information and belief, intentionally kept his activities difficult to discover by, *inter alia*, not including his current activities on his social media pages.

2

6.          As a result of Mr. Weatherford's blatant disregard of his obligations to ITW and his intentional use of ITW's trade secrets to compete against ITW, ITW seeks to recover for the substantial damages sustained to its business in the amount of at least $15,000,000.00.

## **PARTIES**

7.          ITW, S.r.l. is an Italian limited liability corporation having a principal place of business at Zona ASI – C. da S. Cusumano 96011, Augusta (SR), Italy.

8.          ITW Technologies, LLC is a Kansas limited liability corporation having a address at 221 North 6th Street, Atchison, Kansas 66002.

9.          ITW, S.r.l. was created in 1999 and ITW operates worldwide, including in Texas.  ITW's business includes, *inter alia*, the cleaning of process equipment and storage tanks for companies in the oil and gas industry.  ITW has developed its business based primarily on its technological expertise and leadership in the industry.

10.        Mr. Weatherford is an individual residing at 1412 N 1st Street, Atchison, Kansas 66002 and may be served at his residence.

11.        SigmaChem, LLC is a Texas limited liability company whose registered agent, Registered Agents Inc., may be served at 15900 Balcones Drive, Suite 100, Austin, Texas 78731.  SigmaChem offers chemical cleaning services in the oil and gas industry in Texas and elsewhere in the United States.

12.        Solid Faction, LLC is a Texas limited liability company whose registered agent, Registered Agents Inc., may be served at 15900 Balcones Drive, Suite 100, Austin, Texas 78731.

13.        Unicat Catalyst Technologies, Inc. is a Texas corporation whose registered agent, Mani Efran, may be served at 5918 South Highway 35, Alvin, Texas 77511.

3

14.        Unicat Process Technologies, Inc. is a Texas corporation whose registered agent, Unicat Catalyst Technologies, may be served at 5918 South Highway 35, Alvin, Texas 77511.

### JURISDICTION AND VENUE

15.        This Court has personal jurisdiction over Defendants because they are residents of the State of Texas and/or committed a tortious act in whole or in part in Texas as provided by TEX. CIV. PRAC. & REM. CODE § 17.042.

16.        This Court has original jurisdiction under 28 U.S.C. § 1331 over ITW's causes of action for misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836(c).

17.        This Court also has supplemental jurisdiction over ITW's causes of action arising under state law pursuant to 28 U.S.C. § 1367, because those claims are so closely related to ITW's claims under the Defend Trade Secrets Act that they form part of the same case or controversy under Article III of the United States Constitution.

18.         This Court has both general and specific personal jurisdiction over Defendants. Defendant Weatherford is the Engineering Manager and Partner of SigmaChem LLC, a Texas limited liability company, and has purposefully availed himself of the laws of the State of Texas. On information and belief, Weatherford is also a Partner of Unicat Process Technologies LLC, a Texas limited liability company. Defendants SigmaChem, Solid Faction, Unicat Catalyst and Unicat Process have principal places of business in this State, and they carry on a continuous and systematic part of their business in the State of Texas.

19.        Venue is appropriate pursuant to 28 U.S.C. § 1391 because, *inter alia*, a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## FACTS

**After Extensive Research, ITW Developed an Improved Method to Clean Process Equipment, Production Units and Oil Tanks Using Its Confidential Processes and Know-how**

20.         ITW is an Italian limited liability company operating worldwide in the business of industrial cleaning, remediation and specialty chemicals. A major part of its business is its proprietary method of "online cleaning", which allows for a quicker and more efficient way to perform cleaning services for process equipment, production units and storage tanks in the Oil & Gas industry. ITW's online cleaning technology is based on cleaning heat exchangers and process equipment in the hydrocarbon phase without having to open the equipment.  This method has significant benefits to the client, including: i) avoiding the need for a shutdown that would create production and monetary loss; ii) recovering the performance of a production unit much more quickly; iii) reducing overall costs; iv) improving environmental and safety performance.

21.         ITW uses specific proprietary methods in its "online cleaning" and decontamination processes that are kept strictly confidential.  The use of those methods provides ITW with a competitive advantage in providing its online cleaning and decontamination services to the industry.

22.         The proprietary technology and methods used by ITW and/or its business partners to operate such technology in connection with ITW's business include but are not limited to: specific and tailor made formulas, operating method and process steps, restricted range of optimal temperature and pressure to operate, optimal flowrates, specific circulation loops to encompass the equipment to be cleaned, as well as the product/fouling samples and data needed to utilize ITW's proprietary technology.   In addition, ITW had developed confidential business information, including confidential information about ITW's customers and partners (including, but not limited to, industrial plant drawings, production units issues, process data, cleaning schedules, problems

and concerns related to facilities and operations, potential applications of services, turnaround schedule); information concerning ITW's consultants and employees, and associated financial information and related facts (including, but not limited to, expertise, compensation); ITW's methods of calculating pricing for its services; historical data on previous offers to customers; business plans, financial forecasts, budgets and other commercial information; customers list (both actual and potential); access to ITW database for ITW personnel; methods of applying services; monitoring methods; product or service ideas or plans; technical developments; engineering designs and drawings; pricing methodologies; cost data; market share data, marketing plans; and contract information.   This confidential technical information and business information are collectively referred to herein as "Trade Secrets and Confidential Information".

23.       ITW's Trade Secrets and Confidential Information are not ascertainable through publicly available sources, and constitute an invaluable asset in this highly competitive industry. ITW invested extensive resources, including both financial resources and manpower, to develop the technology used in its business and to develop and maintain its business information.

24.       ITW has taken reasonable steps to protect its trade secrets. As a matter of practice, ITW requires all employees and consultants who have access to confidential, proprietary, or trade secret information to agree not to disclose that information. Further, employees and consultants agree to assign any inventions or intellectual property developed in the course of their employment to ITW. ITW maintains a policy and practice of labeling confidential documents. ITW trains its employees and consultants, both upon hiring and periodically thereafter, on the importance of maintaining the confidentiality of documents and information, as well as the proper administration of the measures to maintain the appropriate confidentiality level. All of the employees' and consultants' computers, email accounts and databases were protected with a

unique username and password combination. ITW also requires any third party who will receive access to its confidential information (including actual and prospective customers, partners, etc.) to enter into nondisclosure agreements.

25.        ITW used these methods in an effort to ensure that all its Trade Secrets and Confidential Information were kept confidential for the duration of Mr. Weatherford's employment, and beyond.

**Justin Weatherford Was in a Relationship of Confidence and Had Access to ITW's Highly Confidential Information For Many Years**

26.        In 2011, ITW was expanding its operations in the North American market. As part of that effort, on or about June 5, 2011, ITW hired Justin Weatherford as a consultant. Mr. Weatherford was hired in that consulting role to manage and further develop the expansion of ITW's business in the North American market.

27.        On the same day he was hired as a consultant, Mr. Weatherford signed a Consulting Agreement ("Consulting Agreement"), a Secrecy Agreement ("Secrecy Agreement"), and a Confidential Information and Invention Assignment Agreement ("NDA").

28.        In his role as a consultant for ITW, on or about January 13, 2012, Mr. Weatherford filed the articles of incorporation for ITW Technologies LCC with the Kansas Secretary of State. Mr. Weatherford did so at the instruction of the Chief Executive Officer of ITW, Marcello Ferrara.

29.        Section 1 of the NDA specifically provides that, even when the consulting relationship ends, the agreement will apply to any subsequent employment or consulting relationship if, *inter alia*, Mr. Weatherford becomes employed by ITW within a year.

**ITW S.R.L.**

**CONFIDENTIAL INFORMATION AND
INVENTION ASSIGNMENT AGREEMENT**

*Consultant Name:* Mr. Justin Weatherford

*Effective Date:* June 19, 2011

      As a condition of my becoming retained (or my consulting relationship being continued) by ITW S.r.l., an Italian company, or any of its current or future subsidiaries, affiliates, successors or assigns (collectively, the "Company"), and in consideration of my consulting relationship with the Company and my receipt of the compensation now and hereafter paid to me by the Company, I agree to the following:

      1.    **Relationship.**  This Agreement will apply to my consulting relationship with the Company.  If that relationship ends and the Company, within a year thereafter, either employs me or re-engages me as a consultant, I agree that this Agreement will also apply to such later employment or consulting relationship, unless the Company and I otherwise agree in writing. Any such employment or consulting relationship between the Company and me, whether commenced prior to, upon or after the date of this Agreement, is referred to herein as the "Relationship."

      30.      On or about January 17, 2012, Mr. Weatherford ceased to be a consultant of ITW and became a full-time employee of the newly formed subsidiary.

      31.      From January 2012 until January 2017, Mr. Weatherford played a central role in ITW's North American operations.  In particular, Mr. Weatherford was responsible for promoting ITW's proprietary cleaning and decontamination methods using its secret process and developing its business in the North American market.

      32.      To facilitate his work, Mr. Weatherford was provided access to ITW's Trade Secrets and Confidential Information.  Mr. Weatherford knew about the actual practical application of ITW proprietary cleaning technology and methods used by ITW in its cleaning business, including, for example, the precise temperatures used, the number of batches, and the amounts of chemicals used.  Mr. Weatherford also had access to ITW's confidential business information, including confidential information about ITW's customers and partners; ITW's

methods of calculating pricing for its services; historical data on previous offers to customers; business plans, financial forecasts, budgets and other commercial information.

33.       As with its other employees, ITW required that Mr. Weatherford sign the Secrecy Agreement and NDA. For example, Sections 3(a)-(e) of the NDA regulate the access, use and maintenance of confidential information:

3.       **Confidential Information.**

(a)       **Protection of Information.**  I understand that during the Relationship, the Company intends to provide me with information, including Confidential Information (as defined below), without which I would not be able to perform my duties to the Company.  I agree, at all times during the term of the Relationship and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company to the extent necessary to perform my obligations to the Company under the Relationship, and not to disclose to any person, firm, corporation or any other entity, without written authorization from the Company in each instance, any Confidential Information that I obtain, access or create during the term of the Relationship, whether or not during working hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved.  I further agree not to make copies of such Confidential Information except as authorized by the Company.

(e)       **Secrecy Obligation, Restriction of Use.**  In consideration of ITW's willingness to make its INFORMATION available to me (hereinafter I will be referred to as the "RECIPIENT"), I undertake to treat as confidential and to hold in strict confidence for a period of ten (10) years from the latest disclosure of INFORMATION any and all INFORMATION made available to me directly or indirectly by ITW (hereinafter referred to as the "DISCLOSER") pursuant to this Agreement, and not to use it in any way, or attempt to use it any way, neither in whole nor in part, except for the purpose of my consultancy , without written consent of ITW.

34.       Also pursuant to the NDA, Mr. Weatherford agreed to return any drawings, designs, specifications or other documents to ITW and not to retain any copies or excerpts in any form.

### ITW's Trade Secrets and Confidential Information Are Highly Valuable and Not Generally Known

35.       ITW's Trade Secrets and Confidential Information derive independent economic value from their secrecy. ITW has spent over 20 years developing and maturing its

specific cleaning procedures and related operational know-how, which required extensive research and testing of various elements. The Trade Secrets and Confidential Information, including but not limited to the formula, ratio of elements in the solution, method of implementing the process , the cleaning process steps, the operating conditions during the cleaning, the equipment to be encompassed in the circulation loop, the number of cleaning batches used, the operational know-how (e.g. pressurizing a tower during the circulation and/or filling the tower above level control, in order to prevent bottom pump cavitation – which allows operating at a higher temperature), the method of selection of the appropriate hydrocarbon carrier to be used during the circulation, the process of filling a tower above the packings/trays level (in order to soak said packings or trays and clean the same), the process of soaking the sludge with a solution of a carrier and a proprietary chemical which results in a significantly more efficient way to clean production units, process equipment and tanks while complying with existing regulations, unlike any other competitor. Access to, and knowledge of, this information provide significant competitive advantages.

36.      Mr. Weatherford was well aware that ITW's Trade Secrets and Confidential Information provide a crucial competitive advantage over its competitors.  In an email dated February 9, 2016—while Mr. Weatherford was employed by ITW—Mr. Weatherford stated:

"ITW requires $1/10^{th}$ of the steam, we can do the job and the refinery can stay in environmental compliance without having to report the shutdown to the EPA as a flaring exceedance. THIS IS HUGE!!! I do not see any way possible our competitors could do this…"

37.      As Mr. Weatherford recognized in 2016, competitors could not do what ITW could do because ITW's proprietary process can only be performed based on the knowledge of the Trade Secrets and Confidential Information. Mr. Weatherford admits as much, for example, in an email dated October 21, 2016 to a client, that:

"ITW has well proven methods of dissolving popcorn polymer in BD units. This being said, the well proven methods work when they are applied according to ITW's know-how (both chemistry

and procedure)".

38.     From Mr. Weatherford's own statements, it is clear that he understands that the chemical and procedural know-how belong to ITW, and that they are an essential part of the correct implementation of ITW's valuable technology.

**Justin Weatherford Destroyed Company Property and Misappropriated ITW's Trade Secrets and Confidential Information to Compete With ITW**

39.     On or about January 9, 2017, Mr. Weatherford, on only a single day's notice, resigned from his position as employee of ITW effective January 10, 2017.     Mr. Weatherford gave no warning that he was going to resign from ITW and explained his departure to Mr. Ferrara by saying that he needed to be closer to his children after his divorce and that he could not perform this type of job any longer. Based on Mr. Weatherford's years of work at ITW, and Mr. Ferrara's full trust in Mr. Weatherford, ITW's management took his explanation at face value. As only later became apparent to ITW, that explanation was false.

40.     In fact, Mr. Weatherford incorporated SigmaChem only ten days after he resigned from ITW, where he performed the same job, but with the intent to compete with ITW. At the time Mr. Weatherford resigned from ITW, he intended to use ITW's Trade Secret and Confidential Information to compete directly with ITW and took steps to conceal his activities from ITW.

41.     In light of Mr. Weatherford's abrupt departure, within a few days of Mr. Weatherford's resignation, Mr. Ferrara accessed ITW's server and Mr. Weatherford's ITW email account to assess whether any immediate action had to be taken in regard to customer requests and administrative tasks.   When he did so, Mr. Ferrara discovered that Mr. Weatherford had deleted all of his emails from his approximately 5 years at ITW from the ITW server.

42.     Mr. Weatherford's deletion of his emails was in direct violation of ITW's

policy on storing documents, and Mr. Ferrara's clear instructions to Mr. Weatherford. In fact on December 26, 2016, just two weeks prior to Mr. Weatherford's resignation, Mr. Ferrara had reiterated via email that all communications and emails had to be kept on the server pursuant to company policy.



43.     As a result of Mr. Weatherford's violation of the company's policy, all correspondence directed to his company account over a period of 5 years is not available on ITW's server.

44.     Mr. Weatherford had to undertake multiple, time-consuming steps to delete his emails from the ITW server.  To do so requires a specific double-delete process where, after deleting an email, the system specifically prompts an alert requiring confirmation from the user that they are willing to *permanently* delete the email. Only after providing confirmation to this alert, the email is deleted. In retrospect, it now appears that Mr. Weatherford's deletion of his emails was part of a plan by Mr. Weatherford to prevent ITW from learning of his intent to take ITW's Trade Secrets and Confidential Information with him to create a competitor.    On information and belief, Mr. Weatherford deleted his emails from the ITW server: (a) knowing that he intended to use his knowledge from working at ITW to compete against ITW; (b) intending to

deceive ITW regarding his pre-departure actions and communications; and (c) intending to hide from ITW his theft of ITW's Trade Secrets and Confidential Information.

45.     For several years after his resignation, Mr. Weatherford's involvement with SigmaChem, and his use of ITW Trade Secrets and Confidential Information, was not ascertainable to ITW because, for at least two years, Mr. Weatherford took affirmative steps to hide his new business from ITW and Mr. Ferrara. For example, Mr. Weatherford's LinkedIn profile continued to list him as employed at ITW for about two years after his resignation.

46.     It was not until about February 2019 that John Soria, a consultant of ITW, fortuitously encountered Mr. Weatheford's LinkedIn profile stating that he was working as Partner and Engineering Manager at SigmaChem. It is apparent from SigmaChem's website that SigmaChem's business is industrial cleaning and decontamination, identical to ITW's business that Mr. Weatherford had managed for the preceding five years, and in direct competition with ITW.

47.     Based on this fortuitous occurrence, ITW then learned that Mr. Weatherford had incorporated SigmaChem LLC in the State of Texas on January 23, 2017, only two weeks after he resigned his position at ITW. According to Texas state records, the three shareholders of SigmaChem are Mr. Weatherford, Defendant Solid Faction and Mr. Brian Staken.

48.     Exhibit C of the NDA contains a non-compete provision, which mandates that Mr. Weatherford refrain from engaging in any activity in competition with ITW for a period of 36 months after termination of his employment. However, Mr. Weatherford violated this provision of the NDA and started competing with ITW only days after he terminated his employment contract.

49.     On information and belief, as explained below, Mr. Weatherford had

planned to misappropriate and illicitly profit from ITW's Trade Secret and Confidential Information even during his employment with ITW.

50.         For example, during Mr. Weatherford's employment with ITW, customers had sent over 3,000 emails with inquiries about ITW's services to Mr. Weatherford's ITW email address. Since Mr. Weatherford's resignation, however, over a period of about three years, no customer emails have been received with inquiries about ITW's business. This pattern indicates that Mr. Weatherford informed ITW's customers, while still employed at ITW and using his ITW email, of his intention to open his own business (in competition with ITW) and to redirect all business inquiries to his new business.

51.         Mr. Weatherford and SigmaChem used ITW's Trade Secret and Confidential Information to obtain contracts with customers that they could not have obtained without doing so.

52.         During Mr. Weatherford's five year employment at ITW, he procured only about 12 contracts. But in a period of just six months after his resignation from ITW, on information and belief, Mr. Weatherford has procured at least six contracts, a rate 500% greater than when he was at ITW. Of these six contracts, three are with ITW's former clients.

**Justin Weatherford, Through Sigmachem, Partnered With Unicat Catalyst to Create Unicat Process and Hire More Former ITW Employees to Further Exploit ITW's Trade Secrets and Confidential Information**

53.         When ITW entered the North American market with its proprietary technology and related know-how, securing contracts with customers required substantial time, effort and financial support.  This effort involved, among other things, building a comprehensive database of confidential information about North American customers (in agreement with the same) that encompasses industrial plant drawings, production unit issues and cleaning schedules.

This information, developed over a period of years, provided ITW with a crucial competitive advantage.

54.     Mr. Weatherford misappropriated all this confidential information gathered over years of work to the benefit of not only his new business, SigmaChem, and but also the later-formed Unicat Process.

55.     As a result of this misappropriation, the newly-formed Unicat Process was able to secure approximately one contract a month, substantially more quickly than ITW had been able to reach that pace of contracts.  Unicat Process was able to do so only because SigmaChem and Unicat Process, unlike ITW, were not burdened with the time and expense of developing the Trade Secrets and Confidential Information. They were able to obtain these contracts extremely quickly solely thanks to the Trade Secrets and Confidential Information that Mr. Weatherford had misappropriated from ITW.

56.     On information and belief, Mr. Weatherford and Unicat Process used ITW Trade Secrets and Confidential Information in obtaining these clients and in performing work for these new clients with ITW's proprietary methods.  On information and belief, Unicat knew, or should have known, that Mr. Weatherford was under an obligation to maintain the confidentiality of ITW's Trade Secrets and Confidential Information.  Unicat knew that Mr. Weatherford was using Trade Secrets and Confidential Information that he had gained from ITW for the benefit of SigmaChem and Unicat.

57.     On information and belief, Unicat Catalyst, either through Mr. Weatherford or by other means, became aware of the potential of ITW's technology paired with its Trade Secrets and Confidential Information and engaged in a concerted effort to capitalize on the fact that Mr. Weatherford misappropriated such information and was privy to details that would

allow ITW's competitors to utilize ITW's technology.

58.        Unicat Catalyst's efforts to misappropriate ITW's Trade Secret and Confidential Information and to illicitly profit from ITW's competitive advantage was not limited to the hiring of Mr. Weatherford and the formation of Unicat Process.  Unicat Catalyst Technologies continued its pattern of obtaining access to ITW's Trade Secret and Confidential Information through hiring other key ITW employees that have access to that information.

59.        On September 4, 2017, ITW hired Eugenio Macaluso as Global Sales Director. As part of his hiring process, on August 13, 2017 Eugenio Macaluso signed a Secrecy Agreement and Non-compete Agreement with ITW. As with Mr. Weatherford, Mr. Macaluso, by being a key manager, also had access to ITW's Trade Secret and Confidential Information.

60.        On December 5, 2017 Eugenio Macaluso resigned as Global Sales Director of ITW.

61.        In or about April 2018, Unicat Catalyst hired Eugenio Macaluso as EMEA and Asia Regional Sales Manager, where he began selling catalysts. Shortly thereafter,  he was also assigned supervision of the sales for industrial cleaning services in direct competition with ITW.

62.        On or about December 22, 2018, Unicat Catalyst created a new entity – Unicat Process – as a result of a joint venture with SigmaChem, Mr. Weatherford's new business. Unicat Process then hired Mr. Weatherford.

63.        Unicat Process's website indicates that it is offering online cleaning, decontamination and tank cleaning services and makes claims about its process that would require using ITW's Trade Secrets and Confidential Information.

64.        Unicat Process's website indicates that it offers identical services to the

public as ITW, on information and belief using the proprietary and patented method described in U.S. Pat. 7,682,460 owned by Marcello Ferrara, CEO and owner of ITW.

65.        On information and belief, since SigmaChem began obtaining contracts in 2017, SigmaChem and Unicat Catalyst have repeatedly used ITW Trade Secrets and Confidential Information to operate their business in competition with ITW.

## CAUSES OF ACTION

### COUNT I: Violations of the Defend Trade Secrets Act of 2016
### (Against all Defendants)

66.        Plaintiffs incorporate by reference the foregoing allegations of paragraphs 1-65 as if fully set forth verbatim herein.

67.        The actions of Defendants, as set forth herein, constitute misappropriation under the Defend Trade Secrets Act, 18 U.S.C. §§ 1831, et seq.

68.        ITW is the owner of certain valuable trade secrets, identified above, collectively as "Trade Secrets and Confidential Information".

69.        These Trade Secrets and Confidential Information are related to products or services used in, or intended for use in, interstate or foreign commerce.

70.        ITW's Trade Secrets and Confidential Information derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and are the subject of efforts that are reasonable under the circumstances to maintain secrecy.

71.        By using ITW's Trade Secrets and Confidential Information in the ways disclosed herein, Defendants have misappropriated, used and/or disclosed Plaintiff's Trade Secrets and Confidential Information. On information and belief, Defendants have performed work for at

17

least two former ITW customers using the same technologies used by ITW.

72.     ITW took reasonable steps to protect its Trade Secrets and Confidential Information.  In particular, ITW specifically notified Mr. Weatherford in the agreements that he entered with ITW.  Paragraph 3(a) of the Confidential Information and Invention Assignment Agreement signed by Mr. Weatherford clearly states that "the Company intends to provide me with information, including Confidential Information […], without which I would not be able to perform my duties at the Company. I agree at all times during the term of the Relationship and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company […] and not to disclose to any person, firm, corporation or any other entity […] any Confidential Information that I obtain".

73.     ITW also provided examples of Confidential Information, for example, paragraph 3(b) of the same agreement indicates that "Confidential Information includes, without limitation: […] (ii) technical data, trade secrets, know-how, research, methods (including, but not limited to, operating methods, methods of applying services, monitoring methods, etc.)".

74.     At the time of disclosure and use, Defendants knew or had reason to know that their knowledge of ITW's Trade Secrets and Confidential Information was derived from a confidential relationship with ITW or from third parties who had a duty to maintain confidentiality and not to use them for their own purposes.

75.     ITW has been damaged as a result of Defendants' use of its Trade Secrets and Confidential Information.

76.     Additionally, Defendants have been unjustly enriched as a result of their misappropriation of ITW's Trade Secret and Confidential Information.

77.     Unless enjoined by this Court, Defendants' acts of misappropriation will

continue and ITW will continue to suffer irreparable harm.

78.        On information and belief, Defendant's continued use of ITW's Trade Secrets and Confidential Information is willful and malicious, and ITW is entitled to recover enhanced damages and its reasonable attorney's fees under 18 U.S.C. § 1836(b)(3).

79.        Plaintiffs demand judgment against Defendants for such damage in the amount of at least $15,000,000, including injunctive relief, actual damages, damages for unjust enrichment, exemplary damages, attorneys' fees, costs and interest, as well as all other relief provided by 18 U.S.C. § 1836(b).

## COUNT II: Violations of the Texas Uniform Trade Secrets Act
## (Against all Defendants)

80.        Plaintiffs incorporate by reference the foregoing allegations of paragraphs 1-79 as if fully set forth verbatim herein.

81.        As detailed above, ITW owns Trade Secrets and Confidential Information that qualify as trade secrets protected under the Texas Uniform Trade Secret Act (TUTSA).

82.        ITW's Trade Secrets and Confidential Information derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use, and are the subject of efforts that are reasonable under the circumstances to maintain secrecy.

83.        Defendants' actions, individually or collectively, have resulted and continued to result in misappropriation of ITW's Trade Secrets and Confidential Information.

84.        Defendants have (i) disclosed or used ITW's Trade Secrets and Confidential Information without ITW's consent; and (ii) at the time of disclosure or use, knew or had reason to know the trade secrets were obtained from someone who had acquired them under

19

circumstances giving rise to a duty to maintain its secrecy or limit its use; or derived from or through a person who owed the Plaintiffs a duty to maintain its secrecy or limit its use.

85.       Mr. Weatherford disclosed ITW's Trade Secrets and Confidential Information that he knew or had reason to know were to be maintained as secret and not disclosed to unauthorized persons, including SigmaChem and/or Unicat.  Mr. Weatherford used ITW's Trade Secrets and Confidential Information for the benefit of himself and his business in competing with ITW.

86.       SigmaChem and Unicat acquired the Trade Secrets and Confidential Information from Mr. Weatherford and, at the time of those disclosures they knew or had reason to know that Mr. Weatherford's knowledge was acquired under circumstances giving rise to a duty owed to ITW to maintain the secrecy of, or limit use of, the Trade Secrets and Confidential Information.

87.       As set forth above, Defendants have willfully and maliciously misappropriated, used, and disclosed Plaintiff's trade secrets in violation of the Texas Uniform Trade Secrets Act, TEX. CIV. PRAC. & REM. §§ 134A.001 to 134A.008.

88.       Defendants should be held liable to Plaintiffs for all actual damages caused by such violations, as well as for exemplary or punitive damages.

### COUNT III: Breach of Contract
### (Against Justin Weatherford)

89.       Plaintiffs incorporate by reference the foregoing allegations of paragraphs 1-88 as if fully set forth verbatim herein.

90.       On June 19, 2011 Mr. Weatherford and ITW executed the Confidential and Invention Assignment Agreement ("NDA"), which is incorporated herein by reference.

91.       In pertinent part, the contract provides that Mr. Weatherford shall not

"disclose to any person, firm, corporation or any other entity, without written authorization from the Company in each instance, any Confidential Information."

92.        Exhibit C of the NDA also provides that Mr. Weatherford not compete with ITW for a period of 36 months after termination of his relationship with ITW.

93.        In consideration of this NDA and subject to its signature, Mr. Weatherford received employment, and a salary of $120,000 per year, plus expenses reimbursement.

94.        Mr. Weatherford breached this contract when he took ITW's confidential, proprietary, and trade secret information and incorporated his own competing business only ten days after resigning from ITW.

95.        As a result of Mr. Weatherford's breach of the NDA, ITW has sustained financial harm due to the disclosure of its Trade Secrets and Confidential Information, as well as the contracts obtained through them by ITW's competitors, including SigmaChem and Unicat.

**COUNT IV: Conversion of Confidential Information**
**(Against all Defendants)**

96.        Plaintiffs incorporate by reference the foregoing allegations of paragraphs 1-95 as if fully set forth verbatim herein.

97.        ITW's Trade Secrets and Confidential Information are the sole property of ITW. Upon information and belief, to the extent that ITW's Trade Secrets and Confidential Information was disclosed or used, these are wrongful actions and deprive ITW of its Intellectual Property rights.

98.        ITW thus was injured and will continue to be injured by Defendants' wrongful conversion of its Intellectual Property rights.

**COUNT V: Common Law Unfair Competition**
**(Against all Defendants)**

99.        Plaintiffs incorporate by reference the foregoing allegations at paragraphs

1-98 as if fully set forth verbatim herein.

100.        Plaintiffs have expended great amounts of time, labor, skill, and money in developing its Trade Secrets and Confidential Information. Mr. Weatherford acquired knowledge of such information by virtue of his consultancy and employment with ITW. Plaintiffs reasonably fear that Defendants have used that information in direct competition with Plaintiffs, and will continue to do so unless enjoined, giving Defendants a special competitive advantage because Defendants are not burdened with the time and expense of developing or acquiring the confidential and proprietary information.  Defendants' actions have caused and, unless enjoined from continuing to benefit from the use of ITW's Trade Secrets and Confidential Information, will continue to cause irreparable injury and damage to Plaintiffs for which Plaintiffs have no adequate remedy at law.

101.        Defendants' unfair competition and the resulting damage to ITW's business reputation have proximately caused, and will continue to cause, ITW substantial damage including loss of business, dilution of goodwill, confusion of potential customers, injury to reputation and diminution in value of its confidential information, technology, and other proprietary data. Defendants' actions are causing irreparable injury to ITW, in an amount that will be difficult to ascertain, if they continue. Defendants' misconduct will continue to cause irreparable harm unless enjoined by this Court.

102.        In addition, ITW should be awarded damages that it has sustained as a result of Defendants' wrongful acts. ITW is further entitled to recover from Defendants' the gains, profits, benefits and advantages they have obtained as a result of their wrongful acts.

**ATTORNEYS' FEES AND EXPENSES**

103.        Plaintiffs are entitled to recover reasonable and necessary attorneys' fees and expenses for Defendants' breach of contract under Chapter 38 of the Texas Civil Practice and

Remedies Code. Plaintiffs are further entitled to recover reasonable and necessary attorneys' fees and expenses for Defendants' theft of trade secrets in violation of the Texas Uniform Trade Secrets Act. TEX. CIV. PRAC. & REM. CODE § 134A.001 *et seq.* Plaintiffs are entitled to recover reasonable and necessary attorneys' fees and expenses for Defendants' misappropriation of trade secrets in violation of the Defend Trade Secrets Act. The Defend Trade Secrets Act, S. 1890, 114th Cong. § 2(b)(3)(A-D).

## **PRAYER**

WHEREFORE, Plaintiffs pray that Defendants be cited to appear and answer herein, and that the Court upon final hearing or trial hereof, Plaintiffs have judgment against Defendants for all relief prayed for herein, including all actual and exemplary damages, injunctive relief, reasonable and necessary attorneys' fees and expenses, and costs of suit, prejudgment and post-judgment interest, and such other and further relief, general or special, at law or in equity to which Plaintiffs may be justly entitled.

Respectfully submitted,

Dated: January 2, 2020

MATHENY LEGAL SERVICES AND CONSULTING, PLLC

/Anthony F. Matheny/
Anthony F. Matheny
Texas State Bar No. 24002543
S.D. Texas Admission No. 303157
5955 Woodway Dr.
Houston, TX, 77057
Tel:  713-817-7062
Email:  anthony@mathenylegal.com

-and-

ROTHWELL, FIGG, ERNST & MANBECK, P.C.
Steven Lieberman
(*pro hac vice application pending*)
Sharon Davis
*pro hac vice application pending*)

23

Davide Schiavetti
(*pro hac vice application pending*)
607 14th Street, NW; Suite 800
Washington, DC  20005
Tel:  202-783-6040

**Attorneys for Plaintiffs**
**ITW S.r.l.**
**ITW Technologies, LLC**